# IN THE UNITED STATES DISTRICT COURT FOR THE WESTERN DISTRICT OF MISSOURI WESTERN DIVISION

| | | |
|---|---|---|
| KATRINA R. THOMAS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-00341-CV-W-NKL |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Before the Court is Ms. Katrina R. Thomas' Social Security Complaint [Doc. # 1].  This case involves a claim for Disability Insurance benefits under Title II and Title XVI of the Social Security Act., 42 U.S.C., §§ 401, *et seq*, and 42 U.S.C. §§ 1381, *et seq*.  Ms. Thomas contests the Defendant's findings that she is not disabled.  For the following reasons, the Court REVERSES and REMANDS the decision of the Administrative Law Judge.

## I.    Background

Ms. Thomas filed an application for disability benefits on June 4, 2009, alleging a period of disability beginning February 15, 2007.  Ms. Thomas alleged that she was unable to work due to uncontrolled hypertension, chronic headaches, blurry vision due to hypertension and cataracts, major depressive disorder, hyperparathyroidism, renal stenosis, obesity, and fatigue.  A first hearing was held

1

by Administrative Law Judge ("ALJ") Evelyn Gunn, during which the case was scheduled for a second hearing so that more evidence could be added to the medical record. After the second hearing, the ALJ denied Ms. Thomas' claim. The Appeals Council denied review, and Ms. Thomas filed an action in this Court.

### A. Medical Record

Ms. Thomas was hospitalized at the Truman Medical Center-Hospital Hill in December 2007, for a hypertensive emergency. A CT scan of Ms. Thomas' head revealed old lacunar infarcts (remnants of a stroke) in the front lobes. [TR-416]. She also had a renal artery ultrasound at this time, which showed less than 50% stenosis (abnormal narrowing) on the right side. On December 27, 2007, Ms. Thomas returned to urgent care for a urinary tract infection. She was prescribed Cipro and Nitrofurantoin, which she stated she did not fill because she could not afford them. On January 3, 2008, Ms. Thomas was seen at the Truman Medical Center for headache, blurry vision, lethargy, fatigue, and diarrhea. She reported continued urinary tract problems, including infrequent urination, urinary retention, and blood in urinating. At this time, Ms. Thomas was on hypertension medications Hyzaar, Felodipine, Losartan, Toprol and Clonidine. She reported having trouble affording Spironolactone, and was on the Wal-Mart $4 prescription plan.

From May 14-17, 2008, Ms. Thomas was again hospitalized at the Truman Medical Center-Hospital Hill for a severe headache that had lasted two days. She was seen by Dr. Michael Ivancic, who diagnosed Ms. Thomas as experiencing

hypertensive urgency, manifested via headache and dizziness. Ms. Thomas' blood pressure was 220/120. Dr. Ivancic noted that her hypertension was "obviously poorly controlled." Ms. Thomas reported that she had been compliant with her hypertension medications. Ms. Thomas' discharge medications included Toprol, Clonidine, Spironolactone, Felodipine, Tylenol, Hydralazine, and Hyzaar. The doctor noted that there were no restrictions on her activity. [TR-314-16].

On May 29, 2008, Ms. Thomas was seen by Dr. Fariha Shafi at the Truman Medical Center. Her blood pressure was elevated at 163/120. Ms. Thomas reported that she had been compliant with her medications, but that she had tried to refill Hydrochlorothiazide but had been told her pharmacy did not carry it in that dose. She reported continued headaches and blurred vision. She was told not to use butter or salt substitutes in her food.

On June 13, 2008, Ms. Thomas was seen again by Dr. Shafi for a severe headache and hypertension. Her blood pressure was 218/138. Ms. Thomas was administered an extra dose of Clonidine and Hydralazine, and experienced "dramatic blood pressure improvement." She also had a renal artery ultrasound, which still indicated less than 50% stenosis on the right side and no stenosis on the left. Dr. Shafi expressed concern about whether Ms. Thomas was compliant with her medication, and noted that as of her last clinic visit, Ms. Thomas was "still unsure of her current antihypertensive regimen," possibly due to the complexity of her medication schedule. She wrote that Ms. Thomas "has had a history of medicine noncompliance [and] repeatedly comes into the emergency department

with elevated blood pressure in a 200 range." Based on a review of Ms. Thomas'
medical records, Dr. Shafi noted that her blood pressure became controlled while
hospitalized but worsened after discharge. She wrote that it appeared that Ms.
Thomas' blood pressure "is well controlled once resuming her medications." She
continued Ms. Thomas on her previous medications, increased the dosage of
Hydralazine and Clonidine, and prescribed Ambien for Ms. Thomas' insomnia and
Ultram for her headaches. Dr. Shafi prescribed a home health nurse to arrange
Ms. Thomas' medications. Ms. Thomas was scheduled to follow up on June 18
for a blood pressure check. However, Ms. Thomas did not show up for this
appointment. [TR-323, 325-26].

Ms. Thomas was seen again on June 30, 2008. Her blood pressure was
124/89 and her condition stable. She stated that she had not been taking her
medications properly in the past. She also reported that she now had a home
health nurse who monitored her blood pressure three times a week. Ms. Thomas
continued to complain of headaches, blurry vision, and trouble sleeping.

From January 25-27, 2009, Ms. Thomas was hospitalized for sharp,
stabbing chest pain and a headache that produced changes in vision. Her blood
pressure was at 240, but decreased to 144 when she was administered Clonidine.
Ms. Thomas reported than she had not taken her blood pressure medications for
more than two weeks, and had been trying to make an appointment but was unable
to do so. [TR-351]. She was also diagnosed with low potassium levels. A CT
scan was performed, which indicated moderate to severe left renal artery stenosis.

Treating physician Dr. Scott Kujath noted that Ms. Thomas had "some noncompliance with medications," but remarked on the number of medications she was taking and reported that Ms. Thomas said that the medications made her "somewhat drowsy" and were "difficult to take." She was prescribed Spironolactone, Felodipine, Toprol, Hydrochlorothiazide, Losartan, Tramadol, Trazodone, and Aspirin. [TR-329-34]. On February 11, 2009, her blood pressure was 170/60. Dr. Kujath posited that her uncontrolled hypertension might be related to significant renal artery stenosis, and recommended a renal arteriography. On February 18, 2009, Ms. Thomas underwent a renal angiogram, which revealed no evidence of significant renal artery stenosis. [TR 349, 342]

On September 12, 2009, Ms. Thomas was hospitalized for fever, chills, headache, muscle pain, and chest pain. She tested positive for influenza. Her blood pressure was at 224/150. Treating physician Dr. Brenda Rogers wrote, "I suspect that the patient does have some nonadherence to medications... the patient is understanding and that she needs to take her medications as directed and keep follow-up appointments [sic]." Ms. Thomas reported feeling depressed due to her health problems and the death of her mother, stating that she has frequent crying spells, difficulty sleeping, and loss of appetite, and occasionally feels hopeless, helpless, and worthless. She was referred for psychiatric treatment. [TR-460-66].

Ms. Thomas began therapy at Swopes Medical Center in October 2010 with Dr. James True. Ms. Thomas stated that she had been depressed since her mother's death in June 2009. She also experienced crying spells, insomnia, and

loss of interest. She stated that she tries to walk every day for exercise. Dr. True diagnosed her with Major Depressive Disorder, and prescribed Zoloft and Valium. She was assessed has having a Global Assessment of Functioning ("GAF") of 32. [TR-823-28, 834-35]. On December 8, 2010, Ms. Thomas informed Dr. True that she was having suicidal thoughts, uncontrollable crying spells, and grief-related hallucinations, and that she often argues with her family members. Dr. True assessed her GAF at 45. [TR-823]. On February 4, 2011, Dr. True reported that Ms. Thomas was depressed and anxious, and assessed her GAF score at 40. He replaced her Zoloft prescription with Romeron. [TR-825].

From October 11-14, 2010, Ms. Thomas was hospitalized again for a headache that had lasted approximately one week, accompanied by lightheadedness and dizziness, as well as chest pain. She refused a wheelchair when admitted. [TR-525]. Treating physician Dr. Maniza Ehtesham wrote, "Patient has not taken any of her blood pressure medicines or any medications for that matter for the past day because she states she felt so bad that she could not move," but noted that Ms. Thomas said she was typically compliant with her medications and "has no issue acquiring her medications." [TR-485]. Ms. Thomas' blood pressure was 248/151, which was reduced to 164/112 when she was administered her home medications. She was again diagnosed with low potassium levels. A CT scan of her head revealed age-related cerebral atrophy and chronic small vessel ischemic disease (restriction of blood to the brain tissue), but

no acute abnormalities. She was released on October 14 with no complaints except for a mild headache and blood pressure of 130/90. [TR-494].

Ms. Thomas experienced a stroke in January 2011 that left her with weakness on her left side. [TR-710]. She reported to the emergency room on January 15, 2011, for high blood pressure, blurry vision, and a bad headache. She stated she had been taking her medications. Family members stated Ms. Thomas was under an extreme amount of stress due to financial matters. [TR-793-801]. She was hospitalized from January 24-28, 2011, for a throbbing headache, blurred vision, lightheadedness, and nausea. Her blood pressure was 220/156, but decreased to 159/108 after she was administered medication. [TR-749]. She stated she was compliant with her medications; however, the treating physician expressed doubts about her compliance. [TR-751]. A CT scan of the head revealed evidence of a new lacunar stroke and extensive demyelination (destruction of the myelin sheath of a nerve fiber[1]). [TR-749]. Ms. Thomas reported that since her stroke in January she had used a walker to ambulate. [TR-676]. On February 9, 2011, Ms. Thomas' blood pressure was 127/83 and her condition was stable, but she reported continued intermittent headaches, insomnia, and fatigue.

From March 8-10, 2011, Ms. Thomas was again hospitalized for blood pressure of 210/130, a severe headache, chest pain, and tingling on the right side

---

[1] See "Definition of Demyelination," MedicineNet.com, http://www.medterms.com/script/main/art.asp?articlekey=11143 (accessed 11/21/12).

of her face. She reported strict adherence to her medications. [TR-707, 711]. CT scans indicated prior strokes but no evidence of a new stroke. She was given a walker for home use. [TR-700]. Ms. Thomas stated she was unable to afford her medications even though all of them were on the $4 list. [TR-662]. She was diagnosed with malignant hypertension, hyperparathyroidism, and hyperlipidemia. [TR-699]. From March 18-21, 2011, Ms. Thomas was hospitalized for blood pressure in the 200s. She complained of mild lightheadedness and weakness on her left side. She stated she was unable to afford her medications. [TR-657]. The medical record states that the left side of her face was drooping slightly, but that she was able to ambulate with a steady gait. [TR-670]. She stated she had "difficulty getting words out" and was having slurred speech, although the treating physician noted at the time she was speaking clearly. [TR-676]. A CT scan of her head again revealed indications of extensive chronic small vessel ischemic disease, as well as extensive demyelination. [TR-687, 718].

Ms. Thomas was hospitalized again from May 14-18, 2011, for chest pain, headache, back pain, and high blood pressure. She had run out of her medications prior to admission. She experienced significant weakness in ambulation and used a walker at home. She stated she had fallen a week prior to her hospitalization. The treating physician stated that "all of her symptoms are most likely related to uncontrolled htn [hypertension]." [TR-880]. She was referred to physical therapy. [TR-858]. Ms. Thomas was seen by physical therapist Catherine Bianco on May 16, 2011. Ms. Thomas reported that she uses a walker and relies on her son to do

household chores, and that when he is not home she stays in her room for fear of falling.  [TR-853-54].

The medical records reveal that after the ALJ's decision, in August 2011, Ms. Thomas suffered a serious stroke.  She was hospitalized from August 20-25, 2011.  She could not feel her right side, was unable to move her right arm or leg, and had slurred speech.  She had been using a walker to ambulate since her stroke in March.  She was diagnosed with right-sided weakness and slurred speech consistent with a stroke, uncontrolled hypertension, hyperlipidemia, depression, acute renal insufficiency, and hypercalcemia, and was admitted to intensive care. [TR-22-26].

### B.     Opinions of Nontreating Sources

Nontreating source Dr. Cameron Smith, doctor of osteopathy, examined Ms. Thomas on January 15, 2011.  Dr. Smith reported that Ms. Thomas told him she experiences psychiatric problems with depression and anger, that she has occasionally thought of hurting herself and others, and that she attempted to hurt herself two years ago by means of an overdose.  Regarding physical symptoms, she stated that walking one block causes her to experience fatigue and headache, and that this condition has not been addressed by a primary care physician, only by the ER doctors.  She also reported that she had had cataracts since 2008 and was scheduled for surgery on February 4, 2011.  Dr. Smith noted that her vision was severely diminished due to cataracts, which he noted "would greatly impair her ability to work," but that her vision should improve with surgery.  She stated

9

that she goes to the emergency room every three months and is hospitalized for a headache and her hypertension. Although she reported having taken her medication that morning, her blood pressure was 221/150. Dr. Smith recommended that she go to the emergency department immediately and stated, "I believe she will need much more aggressive control of her blood pressure, and I believe that a blood pressure of this high puts her at much increased risk of stroke and heart attack," and that she "certainly needs a primary care physician."

Dr. Smith stated that once Ms. Thomas' cataracts were corrected and her blood pressure controlled, "she should have very little limitations," although he hesitated to set "firm limits on her ability to exert herself" prior to seeing the results of a cardiac exam. He stated that in her current state, Ms. Thomas should be able to sit for 4-6 hours in a normal 8-hour workday, and stand for 1-2 hours; that she would have trouble walking a significant distance, but that she needs no device for ambulation; and that her ability for gross and fine motor hand grip seemed to be intact. [TR-640].

Nontreating source Dr. Alan Israel, a psychologist, examined Ms. Thomas for her Social Security application on February 23, 2011. He reported that Ms. Thomas told him that she was born with a hole in her heart, as a result of which she missed a lot of school growing up. In 1994, she went to prison for one year as a result of being in car where there was a drug sale. While in prison, she received treatment for her past cocaine use. Ms. Thomas informed Dr. Israel that she had worked at light industrial jobs, and that from 2005-07 she worked at Price

Case 4:12-cv-00341-NKL   Document 11   Filed 12/10/12   Page 10 of 26

Chopper, but was fired due to blood pressure-related health problems. She further told Dr. Israel that she has some friends and enjoys cooking, going to the movies, and bowling. She stopped bowling because of her health problems but hopes to resume it. She also stated that she has felt depressed for the past three years due to medical and financial problems, issues with her children, and the death of relatives. She said "she finds herself going off on people," so she tries to avoid social interaction. Ms. Thomas denied suicidal thoughts and hallucinations but stated she felt hopeless and helpless. She stated that the medications have not reduced her level of depression. Dr. Israel assessed Ms. Thomas as having adjustment disorder with depressed mood, which resulted in mild limitations in interactions with the public, coworkers, and supervisors. [TR-650]. He concluded that Ms. Thomas' impairments were primarily physical and that she was capable of understanding and remembering instructions, concentrating on simple tasks, interacting socially, and adapting to a work-related environment. [TR-654].

### C. Claimant's Testimony

Ms. Thomas testified that she experiences headaches, light-headedness, and dizziness due to her high blood pressure. She stated she was hospitalized in the spring of 2011, because she could not breathe, was light-headed and dizzy, had a pounding headache, and was experiencing chest pains. She testified that her high blood pressure makes her feel "weak" and like she "can't hardly move," and that the medication makes her light-headed, drowsy, and dizzy. She also stated that she feels fatigued. She testified that her legs feel weak and her left side "wiggles"

if she stands for more than five minutes at a time. She stated that when she was discharged from the hospital in March 2011, she was given a walker and told to use it all the time. She also testified that she can only walk half a block at a time before she is out of breath and has to stop. She stated she experiences swelling on her left side, and because of this can only sit for five or ten minutes at a time before needing to walk around for five minutes and stretch.

Ms. Thomas also testified that she has blurry vision and sees white dots, and that her scheduled cataract surgery had to be delayed because she was in the hospital for blood pressure at that time. Ms. Thomas further testified that she experiences depression that makes her "want to harm somebody," that she has trouble sleeping, and that her psychiatrist, Dr. True, suggested she enter a psychiatric hospital to address her depression. She also stated that after she experienced several falls and a stroke in 2010, she stopped doing household chores, and now depends on her adult son and her sisters to do them. She testified that she no longer participates in any social activities, except for seeing her family and playing games with them for about an hour and a half at a time.

### D. Third Party Statements

On April 14, 2009, Ms. Thomas' daughter completed a "Daily Activities Questionnaire" regarding her mother, in which she stated that Ms. Thomas occasionally plays cards with family, cooks, shops with the help of her daughters, cleans and does laundry; has no trouble with personal grooming; sometimes has difficulty getting along with others; and does not participate in social activities like

community or church groups.  Three other people including two of Ms. Thomas'
friends and her sister-in-law filled out the same questionnaire, and their answers
are virtually identical to the answers given by Ms. Thomas' daughter.

### E.    ALJ's Decision

The ALJ found Ms. Thomas' uncontrolled hypertension to be a "severe"
impairment, but that her depression and cataracts were non-severe.  The ALJ
concluded Thomas had no restriction of activities of daily living, mild difficulties
maintaining social functioning, and mild difficulties maintaining concentration,
persistence or pace with no episodes of decompensation.  [Tr. 38-39].  The ALJ
determined that Ms. Thomas was capable of light work with some limitations, and
that although she could not perform her previous work as a small parts assembler,
other jobs existed in the national economy which she could perform.

## II.    Discussion

### A.    Legal Standard

To establish disability, a claimant must prove that he is unable to engage in
substantial gainful activity by reason of a medically determinable impairment that
has lasted or can be expected to last for a continuous period of 12 months or more.
*See* 42 U.S.C. § 423(d).  In reviewing the Commissioner's denial of benefits, the
Court considers whether the ALJ's decision "is supported by substantial evidence
in the record as a whole."  *Muncy v. Apfel*, 247 F.3d 728, 730 (8th Cir. 2001); *see
also Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008).  "Substantial evidence" is
less than a preponderance, but must be sufficient for a reasonable mind to find it

adequate to support the conclusion. *Eichelberger v. Barnhart*, 390 F.3d 584, 589 (8th Cir. 2004); *see also Krogmeier v. Barnhart*, 294 F.3d 1019, 1022 (8th Cir. 2002). The Court must consider evidence that detracts from as well as supports the ALJ's decision. *Black v. Apfel*, 143 F.3d 383, 385 (8th Cir. 1998). If the substantial evidence makes it equally possible to form two opposite conclusions, one of which accords with the ALJ's findings, the Court is obligated to affirm the ALJ's decision. *Mapes v. Chater*, 82 F.3d 259, 262 (8th Cir. 1996); *see also Finch*, 547 F.3d at 935.

A claim of disability is assessed via a five-step sequential evaluation. 20 C.F.R. § 404.1520(d) (2012). The ALJ first asks 1) whether the claimant has engaged in substantial gainful activity since the alleged onslaught of her disability; 2) whether the claimant has a severe impairment(s) that limits her ability to engage in basic work activity; and 3) whether her impairment(s) meets or equals the listing of impairments promulgated by the Social Security Administration ("SSA"). If the ALJ finds that the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed disabled. If the impairment(s) does not meet or equal the listings, the ALJ asks 4) whether the claimant has shown that her impairment(s) prevents her from performing her previous employment. If the claimant can show this, the burden shifts to the Commissioner to show 5) that there is other work available in the national economy that the claimant could perform. *Bowen v. Yuckert*, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291 (1987); *Fastner v. Barnhart*, 324 F.3d 981, 983-84 (8th Cir. 2003).

### B.    Whether the ALJ Properly Formulated the RFC

Ms. Thomas argues that the ALJ failed to properly assess her Residual Functional Capacity ("RFC").  RFC is defined as "the most a claimant can still do despite his or her physical or mental limitations."  *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004) (internal quotes omitted).  The ALJ must base the RFC "on all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his limitations." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001).  This assessment also takes into account the combined effect of both "severe" and "not severe" impairments.  20 C.F.R. § 404.1545(e).

In assessing Ms. Thomas' RFC, the ALJ determined that Ms. Thomas had the ability to: continuously lift and carry up to 20 pounds; sit for eight hours in an eight-hour workday; and stand/walk for 30 minutes a time, for a total of 2 hours in an eight-hour workday.  She further determined that Ms. Thomas had no limitations using her upper or lower extremities; could occasionally climb stairs and ramps but never climb a ladder, rope, or scaffold; could continuously balance; occasionally stoop, kneel, and crouch; could continuously crawl; could occasionally be exposed to unprotected heights; could constantly or continuously be exposed to moving mechanical parts; could never operate a motor vehicle; could occasionally be exposed to humidity, wetness, dust, odors, fumes, pulmonary irritants, extreme temperatures, cold and hot and vibrations; would have no limitation regarding noise; and would have mild limitations in her ability

to interact appropriately with the public, supervisor, and coworkers; and would have mild limitations in responding appropriately to work situations and changes in routine work setting. The vocational expert determined that based on this RFC, Ms. Thomas could perform light unskilled work in a seated position, such as dispatcher or routing clerk, clerical assistant or office helper, or mailroom clerk. The vocational expert further testified that these jobs could not be performed by someone who had to elevate their legs above their hips or lie down in excess of one hour during an eight hour workday.

Ms. Thomas alleges that the ALJ's RFC formulation was inaccurate because the ALJ failed to explain the weight given to the various medical opinions and because the ALJ unreasonably found Ms. Thomas' alleged limitations not credible.

### 1. *Whether Proper Weight was Given to Medical Opinions*

### a. **Physical Impairments**

In determinations of disability, the treating physician's opinion is given "controlling weight," absent inconsistencies or where supported by "more thorough medical evidence." *Prosch v. Apfel*, 201 F.3d 1010, 1012, 1013 (8th Cir. 2000) (internal quotes omitted); *see also Owen v. Astrue*, 551 F.3d 792, 798 (8th Cir. 2008); *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006); 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2). Whereas "an ALJ may consider the opinion of an independent medical advisor as one factor in determining the nature and severity of a claimant's impairment," *Harris v. Barnhart*, 356 F.3d 926, 931 (8th Cir.

2004), "the opinion of a consulting physician who examines a claimant once or not at all does not generally constitute substantial evidence." *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999) (internal quotes omitted); *see also Cox v. Barnhart*, 345 F.3d 606, 610 (8th Cir. 2003) ("[T]he results of a one-time medical evaluation do not constitute substantial evidence on which the ALJ can permissibly base his decision."). An ALJ may credit the assessment of a nontreating physician where it is generally consistent with the record of the treating physicians. *See Jenkins*, 196 F.3d at 924.

The ALJ stated that she generally adopted the opinion of the consulting physician, Dr. Smith, but declined to adopt his opinion as to Ms. Thomas' ability to stand, walk, and sit. She did not state why she chose to dismiss this aspect of Dr. Smith's opinion. [TR-41]. The ALJ must "always give good reasons" for the weight given to medical opinions, and must support these reasons with evidence from the record. *Prosch*, 201 F.3d at 1013 (internal quotes omitted). After examining Ms. Thomas in January 2011, Dr. Smith stated that in her current state, Ms. Thomas should be able to sit for 4-6 hours in a normal 8-hour workday and stand for 1-2 hours; that she would have trouble walking a significant distance, but that she needs no device for ambulation; and that her ability for gross and fine motor hand grip seemed to be intact. He also suggested that once her blood pressure was under control and she underwent cataract surgery, "she should have very little limitations." [TR-640]. However, in the months following Dr. Smith's assessment, Ms. Thomas was hospitalized five times for hypertension-related

17

symptoms, including headaches, chest pains, inability to move her right side, weakness on her left side, blurred speech, and sudden falls. She also reported using a walker to ambulate consistently since March 2011. Dr. Smith conducted his assessment of Ms. Thomas prior to these increasingly severe incidences of hospitalization. Additionally, the ALJ made her determination prior to Ms. Thomas' last hospitalization of record, when she suffered a stroke in August 2011. The district court may consider medical reports submitted after the hearing. *See Jenkins*, 196 F.3d at 924; *Cunningham v. Apfel*, 222 F.3d 496, 499 n.3 (8th Cir. 2000); *Frankl v. Shalala*, 47 F.3d 935, 938 (8th Cir. 1995). It is clear that when the reports post-January 2011 are taken into account, Dr. Smith's assessment of Ms. Thomas' physical capabilities is consistent with the medical records of her treating physicians. Furthermore, in light of Ms. Thomas' stroke in August 2011, which left her unable to move her right arm and leg, Dr. Smith's assessment is clearly overly optimistic; her actual limitations as a result of her strokes and uncontrolled hypertension are much more severe. Therefore, the ALJ's decision to disregard without explanation the physical limitations assessed by Dr. Smith, the consulting physician, is not supported by the medical record; the medical record in fact indicates that Ms. Thomas' limitations are even greater than Dr. Smith indicated. Remand is appropriate for a determination of Ms. Thomas' RFC that takes into account Dr. Smith's assessment as well as any increased physical limitations resulting from the strokes that occurred after his assessment.

**b.     Mental Impairments**

In evaluating mental disorders, the ALJ considers whether a medically determinable mental impairment exists; what limitations such impairment poses on the claimant's ability to work; whether those limitations are severe; and whether the limitations have lasted or are expected to last for at least 12 months. 20 C.F.R. § 404, Subpart P, App. 1, Para. A. The ALJ may consider medical evidence, the claimant's subjective descriptions of her symptoms, and any behavior that indicates psychological abnormalities. 20 C.F.R. § 404, Subpart P, App. 1, Para. B.

Ms. Thomas argues that in assessing her depression, the ALJ failed to consider the medical records of Dr. True, her treating psychologist, and instead placed undue weight on the opinion of Dr. Alan Israel, a psychologist who examined Ms. Thomas once for her Social Security application in February 2011. Dr. True diagnosed Ms. Thomas with Major Depressive Disorder and assessed her GAF at 32, 45, and 40 in October 2010, December 2010, and February 2011, respectively. A GAF score is "subjective determination based on a scale of 100 to 1 of the clinician's judgment of the individual's overall level of functioning." *Lee v. Barnhart*, 117 F. App'x 674, 678 (10th Cir. 2004) (internal quotes omitted). The American Psychiatric Association has stated that a GAF score between 31-40 reflects "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood," while a GAF of 41-50 reflects "[s]erious symptoms (e.g. suicidal ideation)" or "any serious impairment in social, occupational, or school

functioning (e.g., no friends, unable to keep a job)." AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 34 (4th ed. 1994) (DSM–IV). The Tenth Circuit has stated that a GAF score of 50 or less suggests an inability to keep a job. *Oslin v. Barnhart*, 69 F. App'x 942, 947 (10th Cir. 2003); *see also Golubchick v. Barnhart*, 2004 WL 1790188 at *4 (E.D.N.Y. Aug. 9, 2004). The Eighth Circuit has stated that a GAF score of 50 "reflects serious limitations in the patient's general ability to perform basic tasks of daily life," and has relied on a vocational expert's opinion that a claimant with a GAF of 50 would be unable to find any work. *Brueggemann v. Barnhart*, 348 F.3d 689, 695 (8th Cir. 2003).

The ALJ relied on the opinion of Dr. Israel, the consulting psychologist, in her determination that Ms. Thomas experienced no limitation in daily living activities, mild limitations in social functioning and concentration, and no episodes of decompensation. The ALJ did not mention Dr. True's records or his assessment of Ms. Thomas' GAF as consistently quite low. Yet the opinion of a consultative physician who examines a claimant only once "is not considered substantial evidence, especially if, as here, the treating physician contradicts the consulting physician's opinion." *Lauer v. Apfel*, 245 F.3d 700, 705 (8th Cir. 2001). Dr. Israel's opinion of Ms. Thomas' limitations conflicts with the opinion of her treating physician, Dr. True, who assessed her depression as much more severe. Dr. True's assessment is also consistent with Ms. Thomas' subjective reports of her depression. Because of the conflict between the opinions of the

treating and nontreating sources, the ALJ's decision to place substantial weight on the decision of the nontreating source is mistaken. Remand is appropriate in order for Dr. True's assessment of Ms. Thomas' psychological state to be included in the RFC.

### 2.    *Whether the ALJ Properly Assessed Credibility*

In formulating the RFC, the ALJ is only required to include in her determination evidence of the claimant's condition that she finds credible. *Roberts v. Apfel*, 222 F.3d 466, 471 (8th Cir. 2000). However, the ALJ may discount allegations of subjective limitations "only if there are inconsistencies in the record as a whole." *Finch*, 547 F.3d at 935 (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir.1997)); *Pearsall*, 274 F.3d at 1218. The ALJ found that Ms. Thomas' hypertension and depression could reasonably be expected to produce her symptoms, but that Ms. Thomas' subjective statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible.

The ALJ based her credibility assessment on two factors: Ms. Thomas' alleged noncompliance with medication, and Ms. Thomas' work history. The ALJ concluded that "her medication are efficacious and medical notes simply reflect that she does not take her medicine as prescribed and, therefore, experienced symptoms related to uncontrolled blood pressure [sic]." [TR-40]. Where a claimant is noncompliant with medication without good reason, the ALJ may consider noncompliance as a factor in assessing her credibility. *See Owen*, 551

F.3d at 800; *Stout v. Shalala*, 988 F.2d 853, 855 (8th Cir. 1993); *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004).

However, the Eighth Circuit has made clear that "if the claimant is unable to follow a prescribed regimen of medication and therapy to combat her disabilities because of financial hardship, that hardship may be taken into consideration when determining whether to award benefits." *Murphy v. Sullivan*, 953 F.2d 383, 386 (8th Cir. 1992); *Tome v. Schweiker*, 724 F.2d 711, 713-14 (8th Cir. 1984). Additionally, the Eighth Circuit has held that "psychological and emotional difficulties may deprive a claimant of the rationality to decide whether to continue treatment or medication." *Pate-Fires v. Astrue*, 564 F.3d 935, 945 (8th Cir. 2009) (internal quotes omitted). Where evidence overwhelmingly indicates that claimant's noncompliance was attributable to mental illness, "the ALJ's determination [that claimant's] medical noncompliance is attributable solely to free will is tantamount to the ALJ 'playing doctor,' a practice forbidden by law." *Pate-Fires*, 564 F.3d at 946-47. However, where there is "little or no evidence expressly linking [claimant's] mental limitations to such repeated noncompliance," noncompliance is not justifiable. *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010).

In this case, the medical records present a more complicated picture of Ms. Thomas' noncompliance than the ALJ recognizes. As the statement of facts laid out above indicates, her doctors consistently remarked that her blood pressure was well-controlled with her medication regimen, but also recognized that the

regimen was exceptionally complex. Ms. Thomas was noncompliant with her medications on several instances. On one instance in May 2008, she was unable to refill a prescription because her pharmacy did not carry it in such a high dose. In June 2008, her treating physician, Dr. Shafi, questioned whether she was compliant, but also noted that her medical treatment regimen, which included six different medications, was quite complex. Dr. Shafi prescribed a home health nurse to help Ms. Thomas take her medication at home. It is unclear from the record whether the visits from the home health nurse have continued and what effect they have had. In January 2009, Ms. Thomas reported that she had not taken her blood pressure medications for more than two weeks, but that she had been trying to make a doctor's appointment but was unable to do so. At this time, treating physician Dr. Kujath also remarked that the number of medications she was taking was quite high, adding that Ms. Thomas said the medications made her drowsy and were difficult to take. In September 2009, her treating physician expressed suspicion that Ms. Thomas was not taking her medications as directed. At this time, immediately after the death of her mother, Ms. Thomas reported symptoms of severe depression, including crying spells, insomnia, loss of appetite, and feelings of hopelessness, helplessness, and worthlessness. In October 2010, shortly after Ms. Thomas was diagnosed with Major Depressive Disorder, her treating physician noted that Ms. Thomas had not taken any medication for the past day because "she felt so bad that she could not move." Her treating physicians continually emphasized the importance of maintaining her treatment

regimen. Beginning in 2011, Ms. Thomas reported compliance with her medications, but stated at several points that she was unable to afford them.

As these facts reveal, Ms. Thomas' noncompliance and suspected noncompliance may have been influenced by several factors, including cost, the complexity of the medication regimen, and her Major Depressive Disorder. Remand may be appropriate where for consideration of whether the claimant's noncompliance with prescribed treatment was excusable due to a justifiable reason, such as a mental impairment. *See Pate-Fires*, 564 F.3d at 945 (referencing *Brashears v. Apfel,* 73 F. Supp. 2d 648 650–52 (W.D. La. 1999)). The Court finds that remand is appropriate to determine whether Ms. Thomas' noncompliance with medication was due to justifiable reasons.

The ALJ also concluded that Ms. Thomas' work history made her claimed functional limitations not credible. The ALJ stated, in full, that Ms. Thomas "has a poor work history. Records reflect that she worked from 1996 through 2003 and again from 2005 through 2006 and never earned more than $17,000. Her work history demonstrates her poor motivation to return to the workforce." [TR-41-42].

Although "[a] lack of work history may indicate a lack of motivation to work rather than a lack of ability," *Pearsall*, 274 F.3d at 1218, there is no evidence in the record that Ms. Thomas' work history is poor. Rather, the contrary is true; although Ms. Thomas never completed high school [TR- 72], was imprisoned for a drug-related offense in 1994 [TR-652], and is capable of only unskilled work, she was consistently employed from 1996-2003 and 2005-2007. She worked a series

of temp jobs involving light industrial small parts assembly line work, as well as at a grocery store. She was fired in 2007 from her grocery store job due to health problems. It is true, as the ALJ notes, that Ms. Thomas' annual earnings never exceeded $17,000. However, as Ms. Thomas' brief points out, this salary is consistent with the average wage for a small parts assembler, $8.00/hour, in a 40-hour workday, 52 weeks a year; as a temp worker, the number of hours available to work is certainly less. The ALJ cannot find Ms. Thomas not credible because the only jobs available to her were minimum wage unskilled jobs.

## III. Conclusion

For the reasons discussed above, the Court finds that the RFC formulated by the ALJ was not based on substantial evidence. The ALJ unduly discounted the medical opinion of Ms. Thomas' treating psychologist, Dr. True, as well as the opinion of the consultative physician, Dr. Smith, whose opinion was consistent with those of the treating physicians. Furthermore, subsequent evidence added to the medical record after Dr. Smith's assessment in January 2011, which included information regarding Ms. Thomas' disabling stroke in August 2011, further undermines the ALJ's decision to disregard Dr. Smith's assessment of Ms. Thomas' RFC. The ALJ also erred in determining that Ms. Thomas' subjective report of her limitations was not credible due to her medical noncompliance and work history. As discussed above, medical noncompliance is not indicative of non-credibility when based on justifiable reasons. Remand is necessary to determine whether Ms. Thomas' noncompliance was justified because of her

difficulties affording the medication, her trouble understanding the medical regimen, and/or the effect her Major Depressive Disorder had on her ability to adhere to her medical regimen.

The case is therefore REMANDED for a new hearing on the issue of Ms. Thomas' credibility and a new RFC determination consistent with this opinion.



s/ Nanette K. Laughrey
NANETTE K. LAUGHREY
United States District Judge

Dated:  December 10, 2012
Jefferson City, Missouri